# UNITED STATES DISTRICT COURT
## For the District of New Hampshire

|
Brian K. Wells,                                    |
                                                   |
*Claimant*,                                        |
                                                   |        Case No. 1:24-CV-00100-LM-TSM
v.                                                 |
                                                   |
Merrill Lynch *et al.*,                            |
                                                   |
*Respondents*.                                     |
                                                   |

## Verified First Amended Complaint for Motion to Vacate Arbitration Award with Incorporated Memorandum[1]

Claimant Brian K. Wells respectfully requests that the Court vacate an arbitration award before the Financial Industry Regulatory Authority, Inc. ("FINRA") in accordance with 9 U.S.C. §10 and states in support thereof as follows:

### Discovery of New Facts Arising Since Filing of the Complaint[2]

1.      On or about April 29, 2024, Brian Wells ("Wells") went to Defendants Merrill Lynch Pierce Fenner & Smith Inc., BOFA Securities, Inc., and Merrill Lynch Professional Clearing Corp. ("Merrill" or "Defendants") physical location at 1 Main Street, Leominster, MA 01453 (the "Leominster Branch").

2.      Wells went there because Merrill had offered an exhibit purporting to be a simulation of Wells's account that showed an account number that Wells had

---

[1] Wells had previously filed an amended complaint to comply with formatting. He titles it as his "first" because it is his first amended complaint pursuant to Rule 15.

[2] To ease Merrill's drafting an answer, Wells has added the new facts at the beginning of the complaint (¶¶ 1- 17) with his original factual assertions following (¶¶ 18-232).

never seen nor recognized. To be sure that he was not responsible for this manufactured account, he went to straighten out the situation in person.

3.     At the Leominster location, Wells spoke with Russell Almstrom, CRPC™ - an assistant vice president, Financial Solutions Advisor.

4.     Mr. Almstrom informed Wells that there was no record of any account under his name. He could find no account for Wells at all.

5.     Wells inquired whether that would be the case in his situation where he had closed his account.

6.     Mr. Almstrom informed Wells that if he had Merrill Edge account, then Mr. Almstrom would be able to access it – even if had been closed.

7.     Because there was no evidence of any account for Wells, Mr. Almstrom stated that Wells could not have possibly had a Merrill Edge account.

8.     Mr. Almstrom speculated that he might not have access to Merrill's Wealth Management accounts.

9.     Throughout the arbitration, Merrill had relied on the fact that Wells had a "Merrill Edge" account. Its entire case rested on this fact.

10.    Wells testified that he never had a Merrill Edge account. He signed up for an account with – according to Bank of America – advisory services that were branded as a "wealth management" services, sometimes under the umbrella of Global Wealth and Investment Management ("GWIM").

11.    After speaking with Mr. Almstrom, it is unclear if Merrill had any account for him. Mr. Almstrom left no doubt that Merrill falsely represented that Wells had a "Merrill Edge" account.

12.    Mr. Almstrom also told Wells that he was a "dual employee."

13.    Mr. Almstrom explained that a "dual employee" is both a Merrill employee and a Bank of America employee.

14.    Mr. Almstrom further explained that, as a dual employee, he had access to a customers' investment accounts with Merrill or Merrill Edge and their banking accounts with Bank of America.

15.    He stated that all Merrill employees are "dual employees" who were able to access their clients' banking records with Bank of America.

16.    During arbitration, Merrill withheld information that was in "Bank of America's possession" including for example, information that was relevant to its misleading marketing efforts and its failure to comply with the "know thy customer" rule promulgated by FINRA.

17.    As explained throughout the initial complaint, Merrill did not comply with discovery in violation of the FINRA rules. In light of Mr. Almstrom's disclosure that all Merrill employees had access to all of its clients' banking records with Bank of America, Merrill willfully withheld relevant information under false pretenses – that the information was inaccessible to Merrill because it was only in Bank of America's possession.

<u>Summary of Action</u>

18.     This action arises due to the failure of the Defendants Merrill Lynch Pierce Fenner & Smith Inc., BOFA Securities, Inc., and Merrill Lynch Professional Clearing Corp. ("Merrill" or "Defendants") to honor option contracts that they sold to their customer, Brian Wells, when he exercised them, breach of contract, breach of fiduciary duty, market manipulation, and violations of Massachusetts Consumer Protection Act. He seeks a review of the arbitrators' December 28, 2023 award that fined him $100,000 for bringing a customer claim against Merrill. *See* Exhibit A.

19.     Merrill's failure to honor its contractual and fiduciary obligations as well as its violations of state and federal regulations are entitled to a statutory review by the Federal Court pursuant to 9 U.S.C. §10(a) on each of the four statutory grounds in that (1) the award was procured by undue means; (2) there was evident partiality; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, and other misbehavior that prejudiced Wells's rights; and (4)  the arbitrators "exceeded his powers" and so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.

20.     For example, FINRA ignored its protocols to cherry-pick arbitrators who would favor Respondents, including one arbitrator who actively conducted business with Respondents' banking arm. Not surprisingly, the arbitrators favored Respondents. They treated the parties differently. For example, they granted Respondents an extension hours after denying Wells who sought the same relief.

21.    The day before the hearing, three FINRA employees coordinated to intentionally deceive Wells into believing the arbitration had been cancelled because an arbitrator – who was located in Pennsylvania – could not attend due to a sudden illness or a scheduling conflict (the reason he could not attend changed). Because it was cancelled, Wells stopped preparing and cancelled arrangements to allow him to stay in New Hampshire during the proceedings. Late that evening, however, it was disclosed to Wells that it was not cancelled. The FINRA employees had simply wanted to interfere with Wells' ability to present his case.

22.    At the hearing, the second Chairman quickly made clear that she – like FINRA – also supported Merrill, exclaiming that she would "100% trust" Merrill's lawyers during the hearing. Merrill took advantage of this blind trust. It relied on manufactured documents and documents where harmful information had been deleted. It also made false statements with impunity. Why be honest when you have "100% trust"?

23.    In contrast to "100% trust", the second Chairman berated Wells when he tried to speak. She frequently interrupted him to yell at him. When addressing him, she seemed to be angry. The panel followed her lead – constantly interrupting him, openly displaying hostility, and acting extremely aggressive towards him.

24.    Each day, their aggressive behavior toward Wells escalated. By day three, it was uncomfortable in the hotel room due to their unchecked aggression.

25.    The entire experience was surreal. As detailed below, FINRA personnel and the arbitrators unforgivingly favored Merrill, they ignored FINRA

rules, they intentionally interfered with Wells' ability to present his case, and they cared nothing about the law nor the facts. They not only fail to fulfill their oaths to act fairly and impartially, but they did so purposefully.

26.    Put simply, this arbitration was a sham. The award should be vacated. It should be vacated because each of the grounds to vacate an award in Section 10(a) of the Federal Arbitration Act are met here.[3]

## Parties

27.    Brian Wells is an individual who resides in Gardner, Massachusetts.

28.    Merrill Lynch Pierce Fenner & Smith Inc. is a Delaware Corporation with a principal place of business in New York, NY.

29.    Merrill Clearing Corporation is a Delaware Corporation with a principal place of business in New York, NY.

30.    BofA Securities, Inc. is a Delaware Corporation with a principal place of business located in New York, NY.

## Jurisdiction and Venue

31.    Subject matter jurisdiction exists here under 28. U.S.C. § 1332. The amount-in-controversy exceeds $75,000.00. The parties are diverse.

32.    Subject matter jurisdiction also exists under 28 U.S.C. § 1331 because the underlying claims raise federal questions of law.

---

[3] If the award is vacated, the matter should not be sent back to FINRA where its employees intentionally sought to deprive Wells of a fair hearing.

33.     Personal jurisdiction over defendants exist because they agreed to arbitrate in New Hampshire. The arbitration was held in New Hampshire.

34.     The Respondents also agreed to be subject to jurisdiction to this Court by completing a FINRA Arbitration Submission Agreement. *See* Exhibit D.

35.     Venue is proper under 9 U.S.C. 10(a). The arbitration was held in, and the award was thus made, in New Hampshire.


## Facts[4]

36.     On or about November 3, 2021, Brian Wells retained Merrill for its brokerage and advisory services. To use Merrill brokerage and advisory services, Wells had to open a Cash Management Account ("CMA Account"). The terms of the CMA Account has an arbitration provision that compels arbitration before FINRA under the FINRA rules which are incorporated into the contract.

37.     In his application to open an account, Wells disclosed that he had not previously traded but had fifteen years of experience working with securities in other fields, including, *e.g.*, as a lawyer and in academia. He retained Merrill because it frequently advertised through Bank of America's online banking and his bank statements to promote that it provided investment advisory services that allowed its customers to have a role in their investments.

---

[4] The analysis section provides more factual details supporting *vacatur* here. The facts alleged herein are verified in the "Verification of Factual Averments, *infra*.

38.     Merrill touted that such customers would be guided and supervised by its elite team of investment advisors. Merrill's services appealed to Wells because he had never actually traded before but wanted to have some active role in his investments. He thus retained Merrill as his investment advisor to guide and supervise him as he began to trade for the first time.

39.     By March of 2022, Merrill made almost half a million dollars in profits for its affiliates, and favored funds under its control by, *inter alia*, selling to Wells option contracts that were illusory.

40.     The options contracts were illusory because Merrill knew that they would not be honored if exercised. In an options contract, a party pays for the option to obligate a counterparty into a bilateral contract to buy or sell securities upon exercise. The option holder pays for the seller to have this ***obligation***. Merrill makes this entitlement clear in its definition of an "option" on its website:

> A particular contract that entitles the holder to buy or sell a number of shares (usually 100) of a particular common stock at a predetermined price (see strike price) on or before a fixed expiration date.

*See* Exhibit H.[5]

41.     Without this obligation, the option holder would receive nothing. Merrill taking payment for options that it intended not to honor is akin to a coffeeshop accepting payment from a customer for a cup of coffee then keeping the money while refusing to give the paid-for cup of coffee to the customer.

---

[5]

https://olui2.fs.ml.com/sve/pages/ecmscontenthandler.aspx?RDN=RDN_Glossary_Web&experience=MyMerrill&termIn=o

42.    Merrill also knew that exercising options were a pivotal part of Wells' investment strategy – a strategy that he discussed in detail with his advisors. By not honoring the options, Merrill thwarted his strategy.

43.    Merrill refused to honor the options so it could realize profit for itself, its affiliates, or favored advisory clients at his expense.[6]

44.    When Wells complained, Merrill retaliated by freezing his account and forced him to take legal action before they would unfreeze it.

## I.    The Statement of Claim

45.    To remedy the situation, on or about June 24, 2022, Wells filed a Statement of Claim (the "SOC") against Merrill Lynch Pierce Fenner & Smith Inc. which he amended to add parties BOFA Securities, Inc. and Merrill Lynch Professional Clearing Corp. A true and accurate copy of the statement of claim is attached as Exhibit B which is incorporated herein by reference.

46.    The SOC sought redress for the dishonored options. It is indisputable that Wells purchased the options and that he exercised them in writing before they expired. It is indisputable that Merrill had actual notice because these trades were cross trades meaning that Merrill and its affiliates were either the counterparty or acting as their agent. Under New York law, it is indisputable that an option is exercised if the counterparty or its agent receives actual notice that an option has been exercised before the expiration period.

---

[6] To avoid a conflict of interest, Wells had repeatedly instructed his advisors that he did not want to buy options if Merrill or its affiliates was the counterparty or otherwise had an interest in them. Merrill disregarded this instruction by executing cross trades where it owned, controlled, or otherwise had an interest in the counterparty.

47.     It is undisputable that Wells lost the benefit of purchasing the underlying security at a lower price than the option price on a later date because the options were not honored. A true and accurate copy of post-hearing filings are attached as Exhibit C and incorporated herein by reference. The FINRA Arbitration Guide instructs that damages are measured by these lost benefits. Exhibit J, at 67.

48.     Wells also sought to recover losses caused by Merrill's other contractual breaches, its breach of its fiduciary duties, its manipulation of the market, its violation of the best interest rule, and its unfair and deceptive trade practices. *See, e.g.,* Exhibits B & C.

## II.     Summary of the Hearing and Resulting Evidentiary Record

49.     The hearing was scheduled for four days, originally to be held in early June of 2022. It was postponed six months. Four hearing days were scheduled from December 5, 2023 to December 8, 2023.

50.     Some arbitrators were at the hearing location while one participated via Zoom from his home in Pennsylvania.

51.     On December 5, 2023, ancillary issues were heard at Merrill's request. The hearing on the merits thus began on December 6, 2023 (the "First Day").

52.     During the morning session of The First Day, the parties gave opening statements. Wells provided a short statement because he would testify to the same later. Merrill's counsel gave a more fulsome opening statement, including a PowerPoint presentation with almost 100 slides.

53.    In the afternoon session, Wells began his case-in-chief by calling Mr. Steven Valji, a purported expert that Merrill failed to disclose during discovery.

54.    Mr. Valji's testimony revealed that he lacked expertise regarding retail trading. He was unable to offer expert testimony because he was unqualified. For his second witness, Wells called Bryan McKinney who was one of his advisors.

55.    During the morning of the Second Day, Merrill called its only witness – Mr. Bryan Friello. Mr. Friello testified that he created a document for the arbitration but otherwise had no personal knowledge of the relevant events.

56.    In the afternoon session Wells testified. He adopted the statements he made in his Statement of Claim.

57.    He testified that he accurately disclosed that he had no trading when he completed his application to open his account. He also testified that he accurately disclosed that he had minimal (or seldom) experience shortly after when Merrill asked for the information in a second application.

58.    But he did not authenticate a third application that Merrill had heavily relied upon because he did not recognize it. Although Merrill maintained that Wells submitted this document online, the application says on its face that it must be mailed to Merrill. This third application was either inauthentic or Merrill obtained it by violating the terms on its face.

59.    After testifying that he disclosed his lack of actual trading experience to Merrill, Wells testified that Merrill provided him with advisory services.[7] He

---

[7] This advisor issue had less import after Merrill disclosed that Wells' option trades were executed as cross-trades. Such execution meant that Merrill controlled these transactions for the counterparty

explained that Merrill provided him with a team of advisors, including Bryan McKinney and Gary Howard. His advisors all held themselves out as his advisors. Their email signatures included the advisor title. He also recalls testifying about a May 7, 2023 conversation with one of his advisors, Matt Buckley, who told him that everyone he spoke to when he called Merrill were advisors who were part of an elite team of advisors.

60.    Mr. Buckley confirmed that the elite team of advisors were serving as his advisor. Merrill withheld the recording of this phone conversation.[8]

61.    He then introduced a form that Merrill completed for the Internal Revenue Service ("IRS") where Merrill reported that it was Wells' advisor. This IRS form rebutted Merrill's contention that it did not act in an advisory capacity.

62.    The Arbitrators interrupted and harassed Wells when he displayed this document that impeached Merrill's central argument. They demanded that he provide them with a paper copy. But two days earlier, Wells was instructed not to reproduce documents in the two voluminous binders with thousands of pre-marked documents that Merrill had distributed to the arbitrators.

63.    Even though the arbitrators had a marked copy of this document in front of them, they berated Wells for not bringing a paper copy.

---

and had an interest in these transactions as an owner, affiliate, or by serving as the counterparty in a fiduciary role. By acting in one or more of these capacities, Wells' email to Merrill providing notice to exercise his options served as actual notice to the counterparty under New York Law.

[8] Merrill withheld or redacted documents to conceal information that it found to be harmful. It withheld this recording because established that Merrill provided advisory services to Wells.

64.     They stopped the proceedings and ordered Wells to make them copies (knowing that he had no printer access) of a document despite having a copy right in front of them. This aggressive behavior had been escalating each day.

65.     While the arbitrator in Pennsylvania brazenly scolded Wells over Zoom for not bringing a paper copy of this IRS form, Wells realized that their aggressive conduct and hostile behavior toward him would only escalate further.

66.     He no longer felt safe. Because his testimony, which incorporated the SOC and its exhibits, was sufficient to prove his claims, he informed the Panel that he would not be returning. He stated that he would make himself available for cross examination over Zoom if Merrill called him as a witness.

67.     He also informed them that instead of giving an oral closing argument, he would upload authenticated exhibits and submit papers that showed liability and detailed damages for each count in the SOC including citations to the applicable law. *See* Exhibit C.

68.     On December 28, 2023, shortly after Merrill uploaded dozens of unauthenticated documents – some created for the arbitration – FINRA posted the arbitrator's award that fined Wells $100,000.[9] *See* Exhibit A.

---

[9] Merrill has masked its lack of evidence in this case by submitting these unauthenticated documents and filing thousands of pages of attorney argument via numerous letters, multiple motions, and random "pretrial" briefs. In fact, the only document that Merrill authenticated is a document that Merrill manufactured for purposes of these proceedings. Although arbitration has looser evidentiary rules, that does not allow a party to submit anything – it still must present evidence that is reasonably reliable.

  Here, Merrill failed to do so. When stripped of this fluff, it offered almost no evidence to counter Wells' claims that it is liable for not honoring options that it sold to him, breaching its agreements, violating the best interest rule, market manipulation, and violating M.G.L. c. 93A (Massachusetts consumer protection statute).

### III.    The Panel's Award Disparages Wells and Fines him $100,000.00

69.    The Panel issued an award that fined Wells $100,000. *See* Exhibit A. The award did not address the merits of the case nor any of the evidence presented. Instead, the arbitrators attacked Wells personally, calling him "erratic" among other things.

70.    The award was not based on any evidence. It intentionally disregarded the law. Even if the fine was warranted – which it was not – fining a customer $100,000 is extremely excessive.

71.    The Panel likely intended for the excessive fine to intimidate him.

72.    On March 28, 2024, Wells provided notice of his motion to vacate the award to Merrill's attorneys, Ceren Unal and Ronald Smith, which he served via email.

### Memorandum of Law

73.    The Federal Arbitration Act (the "FAA") provides the following grounds that warrant vacating an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*See* 9 U.S.C. § 10. The United States Supreme Court has also recognized the non-statutory ground of manifest disregard of the law as an additional basis for vacating arbitration awards. *See Wilko v. Swan*, 346 U.S. 427, 436–37 (1953); *Tinaway v. Merrill Lynch & Co.*, 658 F. Supp. 576, 578 (S.D.N.Y. 1987).

74.    The arbitration award here should be vacated because each of these independent grounds are satisfied. *See id.* In fact, some are satisfied multiple times for different instances of misconduct. Taken together, FINRA, Merrill, and the arbitrators' acts show a concerted effort to subvert the arbitration process.

75.    FINRA and its arbitrators decided early that they would use their power to not only to prevent Wells from recovering an award, but also to excessively sanction him for unidentified violations of its orders.

76.    Their efforts started shortly after he filed his Statement of Claim. Some were annoying, including for example, FINRA resorting to tricks like "accidently" double-billing Wells.

77.    In another instance, FINRA represented to Wells that – under its rules – someone in his family would need to pass away for FINRA to grant a one-day extension for him to submit his arbiter ranking. But right after he submitted his list, he learned that FINRA had granted Respondents' a one-day extension to submit their list. Luckily, no had died in opposing counsel's family.

78.     Other efforts were more concerning. For example, FINRA disregarded its procedures to compile its list of arbitrators. It ignored its policies that required it to select local arbiters which resulted in FINRA empaneling a Chairman from southern Rhode Island (the "Rhode Island Chairman"). FINRA empaneled him even though he used Merrill's affiliate for his banking needs which might explain why this Monopoly card is in the "community chest" pile instead of the "chance" pile:



79.     The Third Circuit affirmed vacating an award because – like here – an arbitrator was appointed with an irregular procedure while in a business relationship with one of the parties on grounds that he was evidently partial. *Rogers v. Schering Corp.*, 165 F. Supp. 295, 302 (D.N.J. 1958), *aff'd*, 271 F.2d 266 (3d Cir. 1959) (holding that "the appointment of Mr. Fanto as an arbitrator was irregular and illegal and that the award was evidently partial")

80.     FINRA also violated its rules in compiling a list of arbitrators by improperly classifying people who had decades of experience in the industry as "public arbitrators" which caused industry insiders to be empaneled as arbitrators. This violation of its rules, of course, worked in Merrill's favor.

81.     In light of FINRA's unabashed disparate treatment and its disregard
of its own rules to make its arbitrator list, Wells requested that it decline to hear
the case so that the parties could arbitrate the claims before a neutral arbitrator.

82.     But Merrill strenuously objected to a new forum even though,
theoretically at least, it would have no impact on the merits. FINRA – who does
business with Merrill – denied this reasonable request.

83.     FINRA disregarding its rules to select arbitrators was just the
beginning. Throughout these proceedings, FINRA and its arbitrators took improper
steps to ensure that Wells did not receive a fair and unbiased hearing. They
intentionally deprived him of the fundamental right to be heard before a fair and
impartial forum. Their numerous efforts here culminated in the issuance of an
unjust award that must be vacated. *See Konkar Maritime Enter., S.A. v.
Compagnie Belge D'Affretement*, 668 F. Supp. 267, (S.D.N.Y. 1987) (recognizing
that courts should not hesitate to vacate an award when a party to arbitration does
not receive a full and fair hearing on the merits).

## I.     <u>The Award Must Be Vacated Because It Was Procured by Corruption, Fraud, and Undue Means</u>

### a.     <u>FINRA Ignored Its Selection Process Rules so that Arbitrators Favorable to Merrill Are Impaneled</u>

84.     As discussed more in Part V, *infra*, FINRA ignored its written
arbitration selection policy to select a list of arbitrators who would be more
sympathetic to Respondent. Merrill's failure to follow its regular procedures to

select arbitrators for its list, including the first chairman who had a business relationship with Respondents' affiliate, requires that the award be vacated:

> The method of appointment as provided in the agreement was not followed, and the arbitrator appointed had a business relationship with one of the parties. These facts, taken together, warranted the setting aside of an award made by such an arbitrator as inherently partial.

*Am. Guar. Co. v. Caldwell*, 72 F.2d 209, 212 (9th Cir. 1934). *See also Catz Am. Co. v. Pearl Grange Fruit Exch., Inc.*, 292 F. Supp. 549, 552 (S.D.N.Y. 1968) ("When an arbitrator is not appointed by the method provided in the arbitration agreement and is found to have a business relationship with one of the parties, vacation of the arbitrators' award as being inherently partial is justified.").

**b.  Merrill Intentionally Subverts the Discovery Process**

85.    FINRA Rule 12505 requires that the parties cooperate in discovery. Merrill purposefully violated this rule.

86.    Merrill was intentionally difficult when the parties conferred on discovery issues. To illustrate, Merrill would ask questions like "what is a header row?" when discussing data in spreadsheet.

87.    In another instance, Merrill refused to agree to rely on SEC filings from EDGAR so that Wells would have to produce hundreds of thousands of pages of documents. After refusing to cooperate to limit the volume of his production, Merrill complained that his production was too large.

88.    Merrill also complained that Wells produced sensitive documents in password-protected batches. When Wells offered to provide the entire production to Merrill, they refused to coordinate a time to download the entire production.

89.    Specifically, Merrill whined about how burdensome it would be to schedule fifteen minutes of time for it to download the whole production from Wells' server.

90.    In another instance, Merrill refused to acknowledge the well-known fact that all computer files do not have readable content. For example, it is well-known that files copied from an Apple computer using OS operating system will create unreadable files if they are saved to a PC using Windows. These "unreadable" files are system files that support the migration between systems.

91.    Merrill feigned ignorance of such files to manufacture grounds file a motion to compel Wells to process tens of thousands of native files into PDF format – a task that it was more than capable of completing. FINRA's discovery guide dictates that native files should be produced. It also states that parties should not be required to process native files to a particular format. These rules were ignored. *See* Exhibit F (a true and accurate copy of the FINRA Discovery Guide).

92.    Merrill may have reached peak absurdity when it accused Wells of withholding information at hearing on a Merrill motion to compel this information where Merrill's moving papers cited to the "withheld" information.

93.    Merrill filed numerous motions to compel production of information or documents that had already been produced. Tellingly, when the Rhode Island

Chairman – who conducted business with the Merrill family – granted these motions to compel and ordered Wells to produce documents or information, he did not have to do anything because all discoverable information had already been provided well before Merrill filed the motion.

i. <u>Merrill Withholds Relevant Documents and Information</u>

94.     Merrill only produced information that it deemed to help its case. It withheld harmful documents. This cherry-picking approach in discovery warrants vacation. *France v. Bernstein*, 43 F.4th 367, 378 (3rd Cir. 2022) (vacating award for fraud under Section 10(a) because party withheld responsive documents and offered false testimony)

95.     For instance, it withheld a May 7, 2022 recording between Wells and Matt Buckley because Mr. Buckley confirmed that he and the rest of the team of elite advisors held themselves out as Wells' advisors and were his advisors.

96.     In another instance, Merrill has not produced the recording of the phone call between Wells and Trey Parker. During this call, Mr. Parker falsely claimed that the Securities and Exchange Commission (the "SEC") had a regulation that mandated that options be exercised orally.

97.     There is no such regulation. Merrill claims that this call was not recorded. It likely exists as Merrill discloses that it records all calls. It is likely not being produced because it exhibits an instance of Merrill's dishonesty.

98.     Merrill has also concealed the purported counterparties to the option trades because disclosing them will hurt their position. It seems that Merrill did not

execute any trade. Instead, the trades were internalized with Merrill and/or one its affiliates serving as the counterparty. Merrill or one of its affiliates may also have had owned, controlled, or had some interest in an advisory client who was the counterparty which would effectively make Merrill be the counterparty.

ii. Merrill Creates, Modifies, and Partially Discloses Documents to Withhold Materials that Contradict Its Positions

99.    Not only does Merrill withhold documents that would harm its positions, it also edited documents to conceal discoverable information from Wells.

100.    For instance, Merrill produced a spreadsheet after it had deleted over 99% of its content. In another instance, Merrill did not produce Wells' customer records.

101.    Merrill also withheld harmful information by only producing a portion of a record, including producing documents with missing pages. For example, it produced printouts from its KDI database which holds its customer's information, but withheld pages from these KDI printouts. At the hearing, Merrill also revealed that it withheld Wells' data that was in its Salesforce system.

102.    Merrill also manufactured fake documents that were presented to the Panel. For instance, Merrill showed purported screenshots of Wells' account that listed an account with over $10 million dollars. Merrill knew that he does not own an account with over ten million dollars in it.

103.    Merrill showed this false account to bolster its argument that Wells was a sophisticated investor even though he had no actual trading experience prior to engaging Merrill for its brokerage and advisory services. On information and

belief, the second Chairman relied upon this fake account with over ten million dollars as a reason to fine Wells $100,000 for bringing his claim.

### c.  Merrill Makes Multiple of False Statements

104.  Merrill has adopted an accuse-and-obfuscate strategy. It first makes false accusations – that it repeats *ad nauseum* – then obfuscates the conversation when the truth of a matter is close to being known. Here, it did so with impunity because it knows that there likely would be no repercussions for intentionally making statements that it knows to be false.

105.  The truth did not matter to Merrill. It made material false statements in almost every filing, including its response to the statement of claim, its motion to dismiss, its multiple motions to compel, and its motion for sanctions.

106.  For instance, in its response to his statement of claim, Merrill represented that it responded to Wells' April 26, 2022 demand letter sent pursuant to M.G.L. c. 93A, § 9. It did not respond to this letter. Amazingly, when Wells moved to compel Merrill to produce this highly-relevant document or state that it did not exist, the Rhode Island Chairman denied his motion.

107.  In its motion to dismiss, Merrill represented that no Merrill affiliate was involved in Wells' trades. Not true. Its documents show that numerous affiliates had a role in these trades.

108.  In its motions to compel and its motion for sanctions, Merrill repeatedly represented that Wells had not produced information that he produced.

109.    For instance, Merrill represented that he had not produced his tax documents. Not true. He produced them on or about April 3, 2023. Merrill, however, either did not review his production or blatantly misrepresented this fact.

i.    <u>False Statements Made Regarding Discovery</u>

110.    Merrill made numerous false statements regarding discovery. It filed motions falsely stating that Wells withheld information that he had produced. It made these false representations when it knew, or should have known, that he had complied with his discovery obligation. It made false statements regarding discovery as a tactic to intentionally interfere with Wells' presentation of his case.

111.    Wells made multiple productions in varying formats to appease Respondents who continued to complain because they sought to avoid the merits. Indeed, when the Rhode island Chairman granted Respondents' motions to compel, Wells had nothing to produce because he had already provided all discoverable information to Merrill.

112.    Although Merrill complained frequently about his production, it failed to identify a single responsive item that was not produced. The follow paragraphs is a partial list of Merrill's statements regarding discovery that are verifiably false:

113.    **False Statement**: "Claimant has failed to produce sufficient information and/or documents in response to multiple of Respondents' requests." *See* Respondents' Motion to Compel (dated February 24, 2023). Not true. Claimant provided the documents and information that Respondents requested. He did so multiple times. The Respondents knew or should have known that this statement

was false. Respondents made this false statement to intentionally mislead and confuse the Panel. They succeeded because the Panel fined him $100,000.

114.    From day one, the Customer fulfilled his discovery obligations and worked with Respondents in a cooperative manner. But they were intentionally difficult, if not subversive.

115.    A brief history shows that Customer was in full compliance with his discovery obligations when this February 24, 2023 motion to compel was filed:

- **October 7, 2022**, Customer served his written responses to FINRA's list of standard discovery requests. Except for a a single substantive objection made on relevance grounds (which he later withdrew to avoid motion practice), he agreed to provide responsive materials once Respondents returned an executed confidentiality agreement.

- **October 10, 2022**: Respondents returned the executed confidentiality agreement.

- **On October 11, 2022**: The next day, Customer started producing over thousands of responsive documents while explaining to the Respondents that he would be producing the most relevant documents first. *See id.*

- **October 21, 2022**: the Respondents served Requests for Production and Requests for Documents.

- **December 18, 2022**: the Customer served a timely response to these requests. Before his responses were due, the Customer also produced thousands of files in their native format which is in accordance with FINRA Discovery Guideline.

116.    As of December 18, 2022, Wells had provided substantially all of the responsive materials that Merrill requested. Because he had substantially complied with his discovery obligations, Merrill complained that files were in native format and moved to compel them to be processed and reproduced in PDF format.

117.    **Misleading statement**: Claimant "provided [files] in a format that Respondents cannot read and is not generally accessible and/or viewable." Respondents' Motion to Compel (dated February 24, 2023)

118.    This statement is misleading because Wells produced the files in their native format – as the FINRA discovery guide recommends. Wells did not change the format to render any file unreadable. Merrill also omits that the files could not be formatted to render them readable. By omitting this fact, they falsely imply that the files could be formatted into a readable form. That is untrue.

119.    Respondents also omit that some of the "unreadable" files that they complained about are a result of transferring a file from an Apple computer running an OS operating system to a computer using a Windows operating system.

120.    Respondents specifically complained about unreadable files that (1) were created when the files were transferred from an OS environment to a Windows environment – *i.e.*, uploaded to Microsoft Sharepoint per Respondents' request; or (2) produced as part of a folder to allow a meaningful review of certain research that the Customer had conducted because such research arguably related to cryptocurrency – the product of two companies whose stocks were subject to the option contracts that Respondents did not honor.

121.    The Respondents knew that these "unreadable" files (e.g., binary files) could not be formatted to render them readable.

122.    They also knew that they contained no relevant information.

123.    The Respondents here were being intentionally obtuse to subvert the arbitration process.

124.    They refused to acknowledge that certain files (*e.g.*, binary files) are unreadable.

125.    They refused to comprehend that non-readable files sometimes are necessary to render other files readable, *e.g.* "unreadable" files that are created when files are transferred from an Apple computer to a PC using Windows.

126.    Respondents played dumb. But they are not dumb. They intentionally acted dumb to file baseless motions to create a burden on Wells as part of a scheme to intentionally interfere with his ability to prepare and present his case.

127.    **False Statement**: "Respondents conferred with Claimant about these issues, but Claimant has refused to remedy them." Respondents' Motion to Compel (dated February 24, 2023). This statement is false. The Customer did not refuse to transform certain unreadable files into a readable format – which is impossible. Respondents were pursuing a "remedy" that they knew was impossible.

128.    Here, Wells sought to address the Respondents' concerns in good faith. He informed them that he did not expect to rely on the folder with his research but it was responsive to their discovery requests so he produced the folders and its contents to comply with the FIRNA rules.

129.    Wells proposed that this folder and any unreadable files be deemed irrelevant and discarded. He also proposed to stipulate that he would not rely on them. These proposals would have protected Respondents and mooted any

reasonable concern that they may have had. Respondents rejected his proposals so they could file a motion to compel.

130.    Respondents were intentionally uncooperative.

131.    They manufactured this issue because they wanted to file a motion to compel with the Rhode Island Chairperson who happens to have a business relationship with the Respondents.

132.    Put simply, ***Respondents' discovery conduct was subversive***.

133.    **False statement**: "It is essential that Claimant produce the requested information and materials, and do so in a generally readable format … ." Respondents' Motion to Compel (dated February 24, 2023). The premise is false.

134.    As of December 18, 2022, The Customer had provided substantially all the responsive information and produced all responsive documents that Merrill had requested.

135.    Merrill's took an absurd position to manufacture motion practice.

136.    Wells still sought to cooperate. To avoid insipid motion practice, he even agreed reproduced the files in PDF format on April 3, 2022.

137.    But Merrill refused to be satisfied.

138.    After he produced the files in PDF, Merrill complained about the volume of documents even though they had refused to agree to obtain SEC filings from the Edgar database to significantly reduced the amount of pages produced.

139.    Merrill again acted difficult on purpose.

140.    This time, Merrill complained that they had to enter passwords.

141.    In response, Wells offered to make the entire production available for download from his server and asked to arrange a time to do that. He said it would take fifteen minutes.

142.    But Merrill declined this offer because it was "burdensome" to schedule fifteen minutes to transfer the files.

143.    Merrill did not want a solution.

144.    Merrill wanted to complain about entering passwords.

145.    Merrill subsequently moved for sanctions for a litany of issues that did not exist.

146.    Merrill complained that Wells had not produced his taxes – he had had produced them.

147.    Merrill complained that he had not provided phone records – he had provided them.

148.    Merrill complained that he had not identified all of his financial accounts – he had disclosed all of his financial accounts. The list went on and on.

149.    He also went above and beyond by processing and reproducing these materials in PDF format. He proposed reasonable solutions to any concerns.

150.    Despite his good faith compliance with discovery, Merrill filed multiple motions to compel that had not basis.

151.    They did so to file a motion for sanctions that the second Chairman should not have even entertained.

152.    But the second Chairman gave "100% trust" to Merrill.

153.    Amazingly, Wells was sanctioned $100,000.00 for discovery violations even though he had produced all responsive materials **_before_** Merrill had moved to compel it. That is absurd.

> d.    The Rhode Island Chairman Treats the Parties Disparately When Presented with the Same Issue

154.    The Rhode Island Chairman – who was also conducting business with Respondents – granted the Respondents Motion to Compel that required Wells to supplement his response with statements that he was not withholding any information as Merrill had requested. Wells complied.

155.    When Wells moved to compel production of highly-relevant materials, *e.g.*, the purported "response" to his 93A Demand Letter, he also sought to require Merrill confirm that it was not withholding any documents or information.

156.    Although the Rhode Island Chairman made Wells confirm as such, he did not require the same for Respondents. The Rhode Island Chairman did not provide a reason for treating the parties differently.

> e.    FINRA and the Arbitrators Coordinated Together to Create Confusion on the Eve of Arbitration

157.    On the eve of arbitration, three FINRA employees informed Wells that the hearing was postponed because the arbitrator in Pennsylvania was sick. As a result, Wells stopped preparing and canceled the arrangements that he had made to

allow him to travel. But later that night, he was informed that the Hearing would be going forward.

158.    A day before this ploy, the new chairman had issued an Order. This chairman was appointed a few days before the hearing. Wells expected the order would be modified in light of the hearing being cancelled.

159.    The new chairman, however, appears to have issued this Order only to rely on it to conclude that Wells was unreasonable for believing three FINRA employees when they told him the hearing was postponed. Indeed, she cited the Order in the award to discredit Wells. It also suggest a coordinated effort.

160.    The fact that three FINRA employees would intentionally provide false information to Wells to interfere with his hearing preparation is very troubling and reason enough to vacate the award.

      f.    <u>The Arbitrators Constantly Interrupts Wells, Yells at Him, Disagrees with Him, and Picks on Him in a Concerted Effort to Intimidate Him</u>

161.    During the hearings in December of 2023, the arbitrators harassed Wells at every moment. The second Chairman interrupted him at every point and constantly yelled at him.

162.    The second Chairman was aggressive on day one.

163.    Each day, her aggression escalated.

164.    The other arbitrators followed suit. They often assisted the new chairman's efforts to interrupt and disparage Wells whenever he sought to speak or examine a witness.

165.    In contrast, the arbitrators acted politely to opposing counsel.

166.    The second Chairman protected them. For example, when opposing counsel made false statements about Wells' discovery, including for example the wrongful assertion that he had not produced tax documents when he had done so, Wells requested that she be put under oath. But the new chairman would not require Merrill's counsel to be put under oath.

167.    The new chairman represented that she trusted the Respondents' lawyers "100%". Her "100% trust" in Respondents allowed them to make false statement with impunity.

g.    The Second Chairman Is Not Former New Jersey Judge Linda Baer – She Is a Florida Woman Impersonating the Judge

168.    Days before the hearing on the merits, the Rhode Ilsand Chairman abruptly recused himself. He was replaced by a woman who, in her disclosures, had represented herself to be Linda Baer, a former New Jersey judge.

169.    The second Chairman was not the former judge.

170.    She has a different middle name than Judge Baer.

171.    She also is a decade or two younger than Judge Baer.

172.    The second Chairman made statements that were inconsistent with the real judge's work. For example, during the hearing, she stated that she was used to case captions that used initials for the parties because she generally handled such cases, *i.e.*, cases involving children or juveniles. But the real Judge Baer handled general matters where the vast majority of titles did not use abbreviated initials.

173.    Based on her reading at the hearing, the second Chairman appears to be borderline illiterate.[10]

174.    According to Facebook and Instagram, the second Chairman is a woman from Fort Myers, FL. *See, e.g.,* www.facebook.com/linda.baer.543/. It is unclear what her prior occupations were – they likely did not involve reading.

175.    Wells was able to find her online profile because he recalled that she resembled Roseanne Barr. But she was much meaner than the real Roseanne Barr.

176.    FINRA knows or should have known that this Florida woman was not a former New Jersey judge.

## II.    The Arbitrators Were Guilty of Misconduct in Refusing to Postpone the Hearing for Sufficient Cause Shown

177.    The arbitrators refused to provide Wells more time by postponing a hearing on two occasions. First, Wells asked for more time to respond to the Respondents' Motion to Dismiss for personal reasons – the loss of a four-year-old child. The arbitrators refused to provide him with more time to adequately respond to the motion to dismiss.

178.    Wells also sought to postpone the December hearing because he had lost preparation time due to three FINRA employees representing that the hearing would be postponed. Not only did he lose time that day, but he needed to travel home each night because he no longer had someone to housesit. The second

_____

[10] Wells was a member of Teach for America where he taught in Atlanta for two years. During his tenure, he was trained in the Success For All reading program that educated teachers on how to evaluate whether a student was simply making phonetic sounds or actually comprehending the written material.

Chairman denied his request. *Coastal General Const. Services, Inc. v. Virgin Islands Housing Authority*, 238 F.Supp.2d 707, (D. Virgin Islands 2002). *affirmed* 98 Fed. Appx. 156, 2004 WL 1096241.

### III.    FINRA and the Arbitrators Exceeded their Powers By Not Conducting the Arbitration in Accordance with Its Rules

  a.  The Rhode Island Chairperson Allowed Merrill to Produce Portion of Documents and Withhold Relevant Documents in Disregard of FINRA's Discovery Rules

179.    *See supra*, Part IV, which is incorporated herein by reference.

180.    As previously discussed, the Rhode Island Chairman treated the parties disparately during discovery. Both parties sought an order compelling the other party to confirm that no information or documents had been withheld. The Rhode Island Chairman granted Merrill this relief. He denied Wells the same.

181.    The Rhode Island Chairperson denied Wells motion to compel Respondents to produce documents in their entirety. The Federal Rules of Evidence require the whole document to be provided out of fairness in the situation where a partial record is submitted into evidence. During discovery, where relevance is much broader vis-à-vis the contours of the relevancy standard for trial evidence, a party should not be allowed to withhold a portion of a document. Especially here because Merrill likely had withheld the harmful portion.

182.    The Rhode Island Chairperson denied a motion to compel Respondents to produce documents that they had a contractual obligation to produce, to produce

the "response" to Wells' 93A Demand Letter, and to produce industry reports that they cherry-picked information from to manufacture a document to use as evidence.

183.    In contrast, the Rhode Island Chairperson granted any motion that Merrill filed regardless of the merits.

184.    For example, the Rhode Island Chairman granted a motion to compel Wells produce "withheld information" even though Merrill's motion to compel papers contained the very information that he allegedly withheld. It is unreasonable to grant a motion to compel production of information that clearly has been produced because the movant uses the very same information – that it obtained from the other party – in their papers. In this situation, at the very least, a reasonable ruling denies this motion as groundless.

### b.    FINRA Violated its Rules When It Selected a List of Arbitrators

185.    FINRA has adopted a written process to select a list of arbitrators. A true and accurate copy of this process is attached as Exhibit E. FINRA disregarded its written selection process here which alone warrants vacating the award here. *See PoolRe Ins. Corp. v. Organizational Strategies, Inc.*, 783 F.3d 256, 262-63 (5th Cir. 2015). FINRA ignored its rules to create a list of arbitrators that would be more favorable to Merrill.

186.    For example, it ignored its policies that require it to first select arbitrators who live within a 75-mile radius of the hearing site. FINRA instead compiled a list where the majority of arbiters lived outside this radius.

187.    The initial list had no arbitrators who resided in New Hampshire. After Wells pointed out this fact out, FINRA replaced two out-of-state arbitrators who could not serve with two New Hampshire residents.

188.    The availability of these New Hampshire arbitrators begs the question: why did FINRA fail to include them in its list in the first place?

189.    FINRA likely omitted them intentionally so the list would include more arbitrators who lived closer to the Respondents. Its list contained many arbitrators who lived a few states away, including for example, Pennsylvania, Rhode Island, Connecticut, and New Jersey.

190.    FINRA sought arbitrators who lived closer to New York, NY where the Respondents have a significant presence. In fact, at least one Respondent's principal place of business is located in New York City.

191.    Here, the result was that more than half of the appointed arbitrators lived in states that were south of Massachusetts, including Rhode Island, New Jersey, and Pennsylvania.[11]

192.    FINRA also populated the list with industry insiders called Non-Public Arbitrators even though its rules mandate that a customer has the right to a Panel comprising solely of Public Arbitrators, *i.e.*, arbitrators who are not connected to the financial industry.

---

[11] Five arbitrators have appointed during this arbitration because two resigned before the conclusion of these proceedings.

193.    For example, FINRA listed an arbitrator who worked at State Street Bank for decades, including as a Vice President, as a Public Arbitrator. FINRA did take her off the list when Wells objected. She was ultimately empaneled.

### c. The Rhode Island Chairman's Appointment Is Sufficient Reason to Vacate the Award

194.    When an arbitrator is not appointed by the method provided in the arbitration agreement and is found to have a business relationship with one of the parties, vacation of the arbitrators' award as being inherently partial is justified. *See, American Guaranty Co. v. Caldwell*, 72 F.2d 209 (9th Cir.1934).

195.    FINRA's appointment of the Rhode Island Chairman was not in accordance of with its policies.

196.    The Rhode Island chairman had a business relationship with the Respondents because their affiliate handled his banking.

197.    These two facts require that the award be set aside for evidently partial. *See id; see also Rogers*, 165 F. Supp. at 302; *Organizational Strategies*, 783 F.3d at 264.

### d. The Arbitrators Intentionally Violated Their Arbitration Oath to Read the Materials and Be Fair and Impartial

198.    FINRA requires that each arbitrator must read and comply with the ethical standards in the Code of Ethics for Arbitrators in Commercial Disputes. *See* Exhibit I.

199.    The arbitrators here violated multiple canons in the Code of Ethics, if not all of them. *See id.*

200.   For example, canon 1 states that "AN ARBITRATOR SHOULD UPHOLD THE INTEGRITY AND FAIRNESS OF THE ARBITRATION PROCESS." The arbitrators here did not uphold the integrity and fairness of the arbitration.

201.   Not surprisingly, the violated multiple subsections of Canon 1.

202.   For example, Subsection A requires that arbitrators "observe high standards of conduct so that the integrity and fairness of the process will be preserved." Here, the arbitrators openly treated the parties in a disparate manner. The Rhode Island Chairman made discovery rulings differently depending on which party sought relief. The second Chairman was openly hostile to Wells. Two arbitrators provided their contact information to Merrill despite the ban on *ex parte* communications.

203.   Subsection B requires that the arbitrators only accept the appointment if they can do so impartially and competently. Here, the Rhode Island Chairman conducted business with Merrill's banking arm. The second Chairman made clear that she favored Merrill. She also seemed to lack the competence to arbitrate the claims here.

204.   The Rhode Island Chairman violated subsection C because he was in a business relationship with Merrill through its banking arm.

205.   Subsection D mandates that arbitrators "avoid conduct and statements that give the appearance of partiality toward or against any party." Here, the second Chairman advised that she would "100% trust" Merrill. When asked if she

would respect decisions by the previous chairman if he had a conflict, she replied she would even if there was a conflict. The arbitrators constantly interrupted and berated Wells while treating Merrill's counsel respectfully. FINRA and both chairmen made disparate decisions when the parties sought the same relief.

206.    FINRA and the arbitrators failed to follow FINRA rules in violation of subsection E: "Where the agreement of the parties sets forth procedures to be followed in conducting the arbitration or refers to rules to be followed, it is the obligation of the arbitrator to comply with such procedures or rules." *See id.* Subsection F states that "an arbitrator should make all reasonable efforts to prevent delaying tactics, harassment of parties or other participants, or other abuse or disruption of the arbitration process." Here, the second Chairman intentionally harassed, disrupted, and abused Wells during the hearing by disrupting him, berating him, and acting aggressively towards him in a hostile manner. The other two arbitrators followed her lead.

207.    Two arbitrators withdrew in violation of subsection H that requires "Once an arbitrator has accepted an appointment, the arbitrator should not withdraw or abandon the appointment … ." These two arbitrators did not withdraw when before or at the initial when they were informed that they had conflicts and/or were not qualified to serve as a public arbitrator. Both arbitrators served long enough to make decisions on dispositive motions before they withdrew. They made these decisions despite their improper appointment. On information and belief, they withdrew in such manner to evade their decision from review.

208.    As discussed throughout this complaint, FINRA and the arbitrators violated Canon II which requires impartiality. Canon II requires that "if an arbitrator is requested to withdraw by less than all of the parties because of alleged partiality, the arbitrator should withdraw." Before or at the initial pre-hearing conference, Wells requires that certain arbitrators recuse themselves due to conflicts. They did not.

209.    As illustrated, FINRA and the arbitrators also violated Canon III which mandates that an "ARBITRATOR SHOULD AVOID IMPROPRIETY OR THE APPEARANCE OF IMPROPRIETY IN COMMUNICATING WITH PARTIES."

210.    FINRA and the arbitrators violated the other canons as well – all in a manner that favored Merrill.

211.    The arbitrators also violated their FINRA oath. In their FINRA oath, each arbitrator also promised that they would arbitrate the matter in a fair and impartial manner. They intentionally did not do so. The arbitrators take an oath to conduct arbitration in accordance with FINRA rules. They intentionally did not do so. For example, three arbitrators, including the Rhode Island Chairman, should not have been empaneled under FINRA rules because they were either industry insiders and/or had a business relationship with Merrill. Despite these rules, these arbitrators ruled on dispositive issues – each time favorably for Merrill.

**IV.    Vacation is Also Warranted Under the Manifest Disregard of the Law Standard Because the Panel Consciously Ignored Applicable Law**

212.    Arbitrators cannot simply ignore the applicable law.

213.    If an arbitrator shows a manifest disregard of the law, the resulting award should be vacated. *Sobel v. Hertz, Warner & Co.*, C.A.2 (N.Y.) 1972, 469 F.2d 1211.

214.    To vacate an arbitral award for manifest disregard of the law, a court must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case. *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir. 1998) (internal citations and quotation marks omitted).

215.    Here, the arbitrators ignored the applicable law in multiple instances.

   a.   <u>The Rhode Island Chairman Ignored Basic Contract Law When He Refused to Order Merrill to Produce Records with Counterparty Information that It Was Obligated to Provide to Wells</u>

216.    The Rhode Island Chairman ignored applicable law when he did not require Merrill to produce counterparty information despite its contractual obligation to do so.

217.    Specifically, he denied a motion to compel Merrill to produce documents that showed the counterparty to the option contracts that were sold to Wells. He did not order them to produce these records even though the terms in the trade confirmations explicitly require that Merrill provide this information to Wells upon his written request. *See, e.g.*, Exhibit G ("For transactions executed as agent, the name of the other party to the transaction (where applicable) and the source and amount of any additional remuneration received will be furnished upon written request.").

218.    The applicable law to enforce contracts is long-established: "[a] written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *See, e.g., Acumen Re Mgmt. Corp. v. Gen. Sec. Nat' Ins. Co.*, No. 09 Civ. 1796(GBD), 2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7, 2012) (citation omitted).

219.    After practicing law for over "50 years", the Rhode Island chairman likely has this law etched deep in his memory. But he ignored it.

220.    The Rhode Island Chairperson also ignored the Security and Exchange Commission's rules and regulations: Rule 10b-10 that required Merrill to disclose this counterparty information upon a customer's request.

221.    Wells also brought this rule to the Rhode Island Chairperson's attention. But again, he ignored it[12].

222.    By ignoring the applicable law here, the Rhode Island Chairman gave Merrill the opportunity to conceal its relationship to the counterparties. Indeed, if there were no counterparties, he provided Merrill with an avenue to conceal the fact that they did not exist. He did so by manifestly disregarding multiple laws.

      b.    <u>The Arbitrators Ignored the Applicable Law Presented to Them</u>

---

[12] In addition to its contractual and legal duty to provide this information to Wells, Merrill also had a discovery duty to produce Daily Activity Reports that it received from the Options Clearing Corporation ("OCC"). These reports identify the parties to each trade made throughout a given day. Merrill did not produce such them. Instead, it had Mr. Bryan Friello cherry-pick data from the Daily Activity Reports to manufacture new documents for this arbitration. In effect, Merrill manufactured new documents to conceal discoverable information that it was obligated to disclose.

223.    Wells also brought the applicable law to the arbitrators' attention in his post-hearing briefs. *See* Exhibit C.

224.    On information and belief, the arbitrators did not read his papers and/or ignored the applicable law provided. *See id.*

225.    For example, the arbitrators ignored New York law that clearly shows an option is exercised upon actual notice to the option writer to find that it did not find liability for the options contracts that it sold but did not honor. *See id.*

226.    For example, the arbitrators ignored basic contract law to not find Merrill liable for making trades on margin despite the contractual terms that forbid such trades. *See id.*

227.    For example, the arbitrators ignored the best interest rule that would create liability for an advisor/broker who executed a trade for an option contract for a client below its inherent value because the advisor/broker could have realized the inherent value of the option without risk. *See id.*

228.    For example, the arbitrators ignored FINRA rules and Rule 10b-5 when it found no liability for market manipulation even though FINRA failed to provide discovery on this issue. *See id.*

229.    The arbitrators also ignored liability under Chapter 93A for unfair and deceptive trade practices, including trebling damages on Merrill's underlying liability. *See id.*

<u>Conclusion</u>

230.    The above list of misconduct is exemplary. Each and every instance has not been alleged due to time and space considerations. FINRA, Merrill, and the arbitrators' committed other misdeeds where they showed bias, disregarded the rules, made material false statements, and/or intentionally deprived Wells of his right to a fair and impartial hearing.

231.    On information and belief, FINRA, Merrill, and the arbitrators worked in cooperation with one another to orchestrate the sham arbitration.

232.    The award should be vacated because it is a result that FINRA and the arbitrators had intended from the start without regard to the rules, the facts, the law, or the merits. For this reason and the other aforementioned reasons, the Court should thus vacate the award pursuant to 9 U.S.C. § 10.

**<u>Prayer for Relief</u>**

WHEREFORE, Wells requests relief as follows:

a.  Enter declaratory relief that (1) the award was procured by undue means; (2) there was evident partiality; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, and other misbehavior that prejudiced Wells's rights; and (4) the arbitrators unlawfully exceeded their authority in violation of 9 U.S.C. §10;

b.  Vacate the December 28, 2023 award in accordance with 9 U.S.C. § 10;

c.  Enter an award in favor of Wells for the amount of his arbitration claim to ensure that parties do not have an incentive to interfere with a party's right to a fair and impartial arbitration hearing;

d.  Remand this matter for further arbitration proceedings before a different arbitration body;

e.  Schedule a hearing on this matter; and

f.  Grant such further relief as deemed appropriate.

August 27, 2024                          Respectfully Submitted,


                                        */s/ Brian K. Wells*
                                        Brian K. Wells, *pro se*


### Verification of Factual Averments

I state under the pains and penalties of perjury that, to the best of my knowledge and belief, the factual assertions made herein are true and accurate. I further state that the attached exhibits are true and accurate copies of what they purport to be.

Dated: August 27, 2024                  */s/ Brian K. Wells*
                                        Brian K. Wells


### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on or about August 27, 2024.

Dated: August 27, 2024                  */s/ Brian K. Wells*
                                        Brian K. Wells